Good morning, Your Honor. May it please the Court, my name is Carlos Cruz, and I represent the petitioner, Mr. Ramirez. The first point I'd like the Court to consider is that this Court in fact has jurisdiction over the petition for review filed in this case. The petition was filed within 30 days of the Board's final order of removal, and as such, this Court should similarly find Well, isn't that the issue? I mean, we've got an order that's dated September 16 and a notice that's dated September 17, and a statute that says we look to the date on the order. So why aren't you out of time? Your Honor, we aren't out of time because we submit to the Court that the date of the removal order in this case is September 17, 2002, and not the earlier date of September 16. And I'd like to point to two factors in the record that show that. Why did you wait until the last day? Your Honor, the petitioner came to me when the clock was already running. I did work for the firm that initially represented this particular petitioner. He came to me after I left, and when he came to me, I only had a matter of days before the clock ran on this particular case. The immediate upon coming to my office, I filed a petition. But the petition was filed timely, Your Honor, and there are two factors in the record that I'd like to point the Court to in making that consideration. First, the index of the administrative record itself provides that the date of the removal order is September 17, 2002. That's the index that contains every document that is contained within that record. And second of all, Your Honor, the Court — We'll ask Ms. Wright, whose office presumably prepared that index, how that happened. But that still doesn't go to the question that I'm concerned about, which is clearly stamped on the face of the order is the date September 16. And as I read the statute, that is the date that triggers the 30-day clock. Your Honor, you're absolutely right. The date of the order is the date that triggers the clock. And the reason why I submit to the Court that it is September 17 as the date of the order is because that is a date that appears on the first page of that two-page document. Now, Congress changed the Act. And what is the precise language that Congress used? Presently, Your Honor, that it is the date, 30 days from the date of the removal order that Petitioner handled. Okay. So we look at the order, not at the cover letter, right? Your Honor, we look to the date of the order. Yes, Your Honor. Okay. What does the order say? The order in this particular says, I submit to the Court, September 17, 2002. Where is it on the face of the order? Your Honor, it's on the first page of that two-page document. Now, the the the That's a cover letter, right? Your Honor, I don't believe that's a cover letter. The the the that particular document is not titled cover letter. It's not titled a transmittal notice. It's not it's not it's not titled date of service. It says date of this notice. And we submit to the Court that that means It's entitled notice. It's not entitled order. Yes, Your Honor, I understand. But nowhere else in that record or in that decision will you find an annotation that says date of this order. If there was an annotation next to the September 16th date that said date of this order, there would be absolutely no argument on my part to suggest to the Court that September 17th is the date of the order. But there is absolutely no annotation next to that date that provides that. Your Honor. Mr. Krugs, I'm looking at, I guess it's the administrative record, page 2, where which is a document issued by the Executive Office for Immigration Review, which says order. It contains the signature of, I believe it's Frederick Hess, who's a member of the Board of Immigration Appeals. And it's got a date of September 16th. It's not, I mean, it's a one line order. This is not a very confusing piece of paper. I understand, Your Honor. And at the bottom, towards the middle of the page, it does provide order. And there is an order which is then entered summarily affirming the decision of the immigration judge. But what I'm suggesting to the Court is that the date at the top is not annotated as date of this order, in that the date on the first page provides date of notice. I understand the Court's concern, but I'd like to also point to the Court that the ---- But the letter, you're then referring us to Administrative Record 1, which is, as Judge Beezer questioned you, the cover letter, and it says, enclosed as a copy of the Board's decision and order in the referenced case. And the statute says we look to the date of the order. I understand that there's obvious ---- obviously, there was confusion, but I'm still wondering whether that's chargeable to the Board because of the way that they send their orders out, or whether it's your fault for not following the statute. I understand that, Judge, and I think I can respond the following way. One, that we always look to the first page of that two-page document. If you look at these orders issued by the Board of Immigration Appeals, in just about every case, the date on the first page is the same date as the second page. But there's a more important point here that I'd like to make, Your Honor, and that is that when I contacted the Board of Immigration Appeals' automated system, which provides case information about trials, hearings, and appeals, that automated system provides that the date of the removal order was, in fact, September 17, 2002. So the Board itself, in its own automated system, provides for that information. And given that the Board has made that determination and has clearly expressed it in that system, which this Court has certainly verified, then we submit that that is the date of the order. Is the practical problem here that for years before the statutory change, the immigration bar understood that, much like a clerk's office, a judge may sign an order on one day, but it isn't until the clerk actually enters the order and issues it that all the time periods run? Your Honor, that may be true. For some practitioners, speaking for myself, I always look at the date of the order, and I also rely on the information that the automated system provides. So if the Board's automated system tells me that that is the date of the order, that is the date I'm going to follow, Your Honor. So even before the statute was changed, if you had received a communication identical to this, would you have computed it from the date of the notice or from the date of the order? I would have done it, Your Honor, from the date of the order, because I believe that is, in fact, the date of the order. And certainly, if I misunderstood the order, assuming I did, then this Court can also take constructive jurisdiction over this petition, i.e., if I in some way was the officer of the Board. Could you look it up on their computer, and it said the 17th. Yes, Your Honor. That's exactly what it says. What could have happened here was, I mean, this date isn't placed there by the hand of Mr. Hess. Somebody just put a stamp on it and might have, you know, not put the 7 on there, you know. Your Honor, it could have been. Yes, Your Honor. It could have been for one of many reasons why that date is different. But all I'm asking the Court to do in this case is to defer to the date that the date that is set forth in the record as the date of this order. Don't we have to do that, though, in order to excuse the noncompliance with the statute under the case law? Don't we have to find that on these facts it was misleading? Your Honor, I believe that you can find that it was misleading, because clearly I believe it was. But I also believe that we should look at the date on the first page of this two-page document, because generally that is the same date that appears on the second page of that document. But for some reason in this case, those two dates differ. Your Honor, I'd like to move on to the Fourth Amendment issue. Well, counsel, I have one question on the jurisdictional thing. Yes, Your Honor. On July 24th, 2003, Ashcroft, through the immigration office, moved to dismiss this case for lack of jurisdiction. Yes, Your Honor. That was ruled on by Judge Tashima and Judge Hawkins on 6-14-03. Yes, Your Honor. Is that binding on this panel? It is not binding, Your Honor. This Court has certainly the authority to entertain a petition by the government to still dismiss for lack of jurisdiction. As a matter of fact, even if this case went to the U.S. Supreme Court, they could raise the question of whether there was jurisdiction. They can certainly do that. So it's an open question for us to look at. It is still an open question, Your Honor. And so I would ask the Court to either find that it was timely or that in some way should be constructively perceived as timely. But, Your Honor, the most important issue here, and I know I'm running out of time, is the Fourth Amendment issue. Go ahead. Thank you. Thank you, Your Honor. I appreciate that. And the Fourth Amendment issue is the reason why we're here today. In this particular case, we have an egregious violation of the Fourth Amendment because of the manner in which the officer stopped Mr. Ramirez. I will submit to the Court that, like in Gonzales-Rivera, the only motivating factor, the only true reason for stopping Mr. Ramirez was his Mexican appearance. And that you're completely ignoring all of the other facts in the record that this was an ongoing surveillance of a known alien smuggler. But let me, can I interrupt you? Sure. Let me tell you this. Yes, Your Honor. Many years ago, I decided a case. And I held that if you stop someone just because of their Mexican appearance, it's an egregious Fourth Amendment violation. And the exception to the exclusionary rule applies, or whatever it is. All right? Yes, Your Honor. So the great Arthur Alarcon called it in bank. You want to know something? I lost. I understand, Your Honor. Did you read it? I did, Your Honor. Are you referring to the Benitez decision? Whatever the name is. Yes, Your Honor. It's been a long time. I believe it was back in 1983, 84, Your Honor. Yeah, well, I mean, I know the case. I can, I'll tell you about the in bank and all the rest of it. Yeah, so I mean, I was really mad about that. But, you know, that's the way they decided. But, Your Honor, three different judges in Gonzales-Rivera also looked at this decision. And there, writing for a unanimous panel, Judge Nelson, I believe, wrote the decision and stated that although there were other factors present. Which Nelson? Judge, I believe, I'm sorry, I was with her on Monday, Your Honor, and I can't. Thornton, Thornton. Thornton, thank you, Your Honor. We've got two Nelsons. I apologize, Your Honor. Nelson, we've got the other one. One from the north, one from the south. But, Your Honor, what was interesting in that case, when I went back to read that decision, Your Honor, there were other factors present in that decision. It wasn't just the testimony of the officer who said I pulled the men over because he was Mexican. But what caused me to react, Mr. Cruz, is your argument that there was only one factor. And that's not true, is it, in this record? Your Honor, the reason I make that statement in such a way is because that's the way that the Gonzales-Rivera court phrased the issue, that because the other factors have such low probative value, that those factors should be disregarded as a matter of law. And so in this case, we would submit to the Court that the ---- But haven't we been roundly rebuked by the Supreme Court for not looking at the totality of the circumstances? I mean, we make that mistake all the time, and they regularly slap us down. Your Honor, the Court did say in Arvizu, I believe it's a U.S. Supreme Court decision issued in 2002, that the Court cited we cannot divide and conquer. We can't look at each individual element aside. You keep arguing again. Don't go there. The Supreme Court has said no. That's not the analysis. I understand, Your Honor, and I understand the Court's point. And I will finish this argument by simply stating that if it wasn't for this man's Mexican appearance, these other factors wouldn't have mattered, that but for his Mexican appearance and the silk shirt the man was wearing on that day, none of these other factors would have mattered. And that takes into account the totality of circumstances. But I think there's a second way of looking at this case. And that is that in Gonzalez Rivera, the Court held that where an officer knows that the conduct or the observations he's relying on are a product or would result in constitutional violation, that that in itself would also constitute an egregious violation of a constitution, prompting the application of the exclusionary rule. And this officer in this case testified that he relied primarily on two factors. I understand that those factors are subdivided. He said Mexican appearance, and he also testified subjective impressions that he himself held based on his experience. Now, this Court in Nicosia v. INS held that subjective impressions do not provide a rational basis for separating legal individuals, and those are here illegally. Well, was that the subjective impressions, was that the testimony about the sandals and the nature of the material, the acrylic or silk clothing that he was wearing? Your Honor, he was subjective. Testified in his experience was clothing that people from Mexico typically wore? Yes, Your Honor. That was one subjective impression that he testified. The other one he testified. But that's subjective. It's subjective if he concludes, but it's objective in the sense that that's what the facts were, right? Your Honor, the fact is that this man was wearing a silk shirt. And sandals. I don't believe there were sandals listed in the testimony. I know that he wasn't wearing a silk shirt. But the point in this case is that it is subjective to believe that a man who's wearing a silk shirt is an alien. There are individuals in this country who wear a silk shirt, who wear a silk tie, that are not aliens, that are here illegally in this country. And so that is clearly a subjective factor. And in Gonzalez Rivera, the Ninth Circuit said we're not even going to bother with that aspect or that observation. It wasn't even mentioned in the analysis of the decision because it was so outlandish that the officer would rely on such a factor. And the other factors here were also subjective. You have the officer stating that people who stood at that, who stayed at the motel were aliens. Not all of them, as he admitted in the record, were in fact aliens. Maybe I'm puzzled over the dictionary definition of subjective, but in any other kind of a Fourth Amendment context, a history of criminal conduct, i.e., alien smuggling, occurring at a known location near the border based upon prior investigations is a factor that law enforcement officers may properly consider in determining whether to initiate a Terry-type investigative stop. Am I correct, or is the law different on the border? No, Your Honor, it's not. Yes, it is a factor that can be considered, but the courts have repeatedly held that it cannot just be based on these subjective impressions, that there has to be something objective. I keep calling it subjective, and I don't see anything subjective about a fact which includes a history of prior illegal conduct occurring at a location that the officers have decided to stake out, because they know that's where crimes are committed. The reason I call it subjective is because it is a factor that describes both individuals who are, in fact, here illegally and possibly committing crimes, and describes individuals who are not here illegally and committing crimes. Now, this Court in U.S. v. Salinas had a perfect example for that problem and for these observations that these officers had in this particular case. They said, look, if you think there's criminality occurring in this place, if you think there's alien smuggling, set up a checkpoint. The Court said set up a checkpoint, and that way you can avoid these stops based on factors that do not rise to the level of a reasonable suspicion. And so, therefore, because all of the factors relied upon in this case were based on, again, subjective factors that a reasonable officer should have known violated the Constitution, that amounted to an egregious violation. Your Honor, I'm not sure if I'm out of time yet. I'd like to know if the Court would like to hear from the due process issue in this case. Well, I've been giving you plenty of time. Thank you, Your Honor. Just very – and I will be brief, Your Honor. I appreciate it. Thank you very much. Judge, the last point in this case is that there was a fundamental – fundamental violation in this case. There was a due process violation. At the date – on the date of the suppression hearing, the immigration judge allowed the government to bring forth the witness and provide counsel with only 10 minutes, which turned out to be 15 minutes in this case, but said, I'm going to give you 10 minutes to review this evidence that deals with whether or not there was an unlawful stop in this case. Your Honor, there was absolutely no way that counsel could have prepared an adequate cross-examination of the witness based on 10 minutes. Counsel needed time to review the evidence, to analyze the evidence, to compare it with case law, to compare it with the client's notes, and so on and so forth. There was no way to get that information. Isn't this the case where there was then a two-month adjournment in which your client was given the opportunity to review the evidence, to call additional witnesses or to recall the witnesses if he wanted, but counsel announced two months later, no, I'm just going to rest on my briefs? Yes, Your Honor. How is the Constitution offended by that kind of accommodation? Your Honor, it is offended because at that point, the witness had already testified. He was already aware of the type of questions that were going to be elicited. He was now prepared to do it. Counsel, you can't have it both ways. You're arguing you didn't have enough time to prepare for a cross-examination, but you don't want to give him too much time while you're preparing for a cross-examination because then he's going to be sandpapered, which is it? Your Honor, it is that counsel should be given a reasonable opportunity to prepare for a cross-examination and that once the witness has testified, every just could have given the counsel two years to prepare any additional information, it would have mattered. Counsel, have you ever been engaged in any civil process where you take depositions months, sometimes years before trial? Your Honor. Everything's under oath, it's on the record, and everybody takes their time and explores and pokes around and takes additional depths and serves some interrogatories. Immigration is a civil proceeding. It's not criminal. I understand, Your Honor, but certainly, although it is a civil proceeding, the consequences Is it due process in the personal injury kind of case and then not in the immigration case? Or are the rules the same? Your Honor, generally the rules that apply in civil proceedings apply in the immigration context. What you're really saying is it's just to come in there at a hearing and you get a big stack of papers and you said you got 15 minutes to cross-examine them. That ain't fair. No lawyer likes to do that. And because you got to come back, you can come back two months later. That's not going to really cure it. That's what you're saying. That's exactly what I'm saying, Your Honor. And I would argue to the Court that this body, this Ninth Circuit should send a message to an immigration judge who gives an attorney 10 minutes to prepare the cross-examination of an officer to say this is completely unacceptable conduct, aliens have a reasonable opportunity to conduct that cross-examination, and the Court would show fine. Thank you, Your Honor. Do you serve any interrogatories? No, Your Honor, because I was never provided with who was going to actually testify on the day of the hearing. Can you serve interrogatories? Can you have pretrial discovery in immigration cases? Your Honor, there's no such procedure available. I practice in the Immigration Court, and there is no such procedure for interrogatories. I'm assuming that someone could request that a witness be subjected to an interrogatory, but it's not common practice. Thank you, Your Honor. Was it common practice to make the immigrant's counsel give them access to these documents before the hearing? Yes, Your Honor, it is common practice, and that's why counsel was so vigorously opposed on the record to going forward, because common practice is to first produce the I-213 report, allow counsel to review those documents, and then call the witness to testify to those documents. That is common practice in the Immigration Court. Do you have any view on lifting the stay after this is submitted? Your Honor, I do have a view, and in this particular case, the stay should not be lifted. Although, if you may, if you – I like – I can address the answer in the following way, that if in this particular case, like in many others, the BIA had extended a voluntary departure period of 30 days, you now lift the stay. The person is then removed. That is divesting the court of now jurisdiction to give that Petitioner, who perhaps had a legitimate, valid claim before this Court, of leaving the country voluntarily within those 30 days. And so, because this Court has the authority to extend that voluntary departure period by removing the stay, you're, in essence, eliminating that authority. And so, on that basis, I would submit that the stay should be removed. What we could do is we could lift – we could delay the lifting of the stay for 30 days. Your Honor, that would be a mechanism to certainly provide that, but again, there the issue would be making sure that the Petitioner receives notice that the stay has been lifted, and at that point, the voluntary departure extension order would have to be issued. I believe that is procedurally much more complicated than simply issuing an amendment. And we just sent the notice to you. Why isn't that adequate? That would be adequate. If the notice did provide that the case will be ruled against Petitioner, you now have 30 days. At that point, I believe that would be adequate. And so, I would accept such an order from the Court, and I think it would be reasonable. The amnesty for the Petitioner from the country is not going to divest this court of jurisdiction. No, Your Honor, it does not, but that's why we also consider the public interest in making sure that the individual remains. You told me I would lose jurisdiction if he would leave the country. No, Your Honor. Authority to issue the voluntary departure. To give him the ability to come back. To give him voluntary departure, Your Honor. He's not going to have the – if he's been ordered deported by the Court, he's no longer entitled to leave voluntarily. Is it voluntary departure when the I.J. decided the – or the BIA decided the case? In this particular case, Your Honor? No, in this particular case, he did not get a voluntary departure. All right. Thank you, Your Honor. Did he ask for it? Your Honor, he wasn't eligible given the finding made by the immigration judge. Oh, because of the smuggling. Because of the smuggling finding. Yes. It goes to the issue of Goodmore current. Okay. Thank you, Your Honor. Thanks, Your Honor. Thank you. Good morning, and may it please the Court. My name is Jocelyn Wright. I'm here on behalf of the Respondent, the United States Attorney General. Now, Mr. Ramirez does bring both Fourth and Fifth Amendment challenges to the validity of his removal order, but we submit that the Court must first determine whether it has jurisdiction over this petition, and our position is that because this petition was filed one day late, the Court lacks jurisdiction to address the substantive issues underlying this case. Would you like to answer my question about Mr. Cruz correctly points out that, you know, whoever prepared the administrative record here, which I assume is either EOIR personnel or oil personnel, made the same mistake that he did and listed September 17 as the date of the order. Doesn't that prima facie establish the fact that the Board misled everybody into thinking that the date of the order was the 17th? No, there are several points to that. First of all, Your Honor, that certified administrative list was not yet in existence at the time the petition for review was filed. It was only produced in response to the 17th. But that doesn't matter. I mean, the point is that it's still misleading everybody, isn't it? Well, no, because the timing for the petition for review is dictated by the date of the order. So to the extent that he's saying, he's suggesting that he's relying on the certified list to justify the late filing. No, I think his point was even the government is confused by the same evidence that he was confused about. And what's your answer to that? That would be the second point, which is that the government contractor at the Executive Office for Immigration Review who certified the list, the extent of her authority was to certify that these were true and correct copies. Her characterization or her description of what that document is, and she noticed it on the certified list, she refers to it as page 1. The fact that she describes it as the decision of the Board of Immigration Appeals isn't legally binding by any means, certainly it doesn't supersede the language of the statute itself. So to the extent that she misdescribed the transmittal letter, the cover letter, as the decision of the Board and put the wrong date, that certainly isn't going to be. Kennedy. So you've got incompetent people working there. Well, I believe it may have been an understandable mistake, Your Honor. What? It may have been an understandable mistake. Well, you know, these cases are riddled with mistakes, you know. There was a time when you couldn't find half the files in downtown Los Angeles. Did you know that? I believe that was before I became an immigration practitioner, Your Honor. How long have you been practicing? Almost eight years. Are you familiar with any case where a stay has not been granted by the court? Even in the situation where the petitioner requests a stay? Yeah. Yes. I mean, there is the ---- You've objected a couple of times, and not very often, but I mean, the government objects from time to time. Yes. But most of the time they just say, we have no position on this. So it's not a stipulation. But are you familiar with any case that a court has said no stay, that Congress has changed the law? Not because of the De Leon decision and the practice under general order of issuing a temporary stay pending. Okay. We have a general order, but still you can contest the matter. Yes. And they can reply, and you can get a panel of judges to decide it. Yes. But the judges never look at these in this circuit. It's the staff attorneys. I believe that. Because of the general order, right? Right. And the general order doesn't comply with the statute, does it? That was our ---- Because it directs the court to do things, not staff attorneys, right? Well, that was our position, Your Honor, yes. Okay. Now, has there ever been a case that you're familiar with where stay has been denied? After the ---- After both parties have briefed the motion, yes. I'm personally familiar with one. It was a case that was actually argued just this Monday in Seattle, where the court did deny it. One out of how many that you're familiar with? I don't do a lot of the circuit counsel or staff. That's spread out throughout our office with the line attorneys. But I do know of at least one or two cases that I've personally been involved in. One or two cases, and it's been on the books now better than a year, right? Yes. Okay. Well, is there ---- I'm not very ---- I'm computer illiterate. But if ---- not like my partner here. But if you're an attorney in your office and you get on the computer to see what the date of the order is, and the ---- would you get this date of the 17th? It's called the Board's Automated System, said September 17th. Do you know anything about that? If that's what the Board's computer system says, then that would be the same information that we would receive. However, the attorneys don't normally check the Board's computer systems. What they do is look at the actual order that comes in that should be attached to the petition. If an American is computer illiterate and they went to Harvard, they'd check that too. If they went to Yale, they'd look at the document. If they went to Yale, they'd go to Morris. Well, I mean, given the number and the volume of immigration petitions for review that we have, if the document is already attached to the petition for review, it's my understanding the attorneys can find themselves looking at that, because that is the best evidence of what the date of the order is. Is this the same contractor at EOIR who enters the data into their automated system? I'm not sure about that, Your Honor. I'm assuming it would be, but I'm not sure. Well, this has been a call for a congressional investigator. Maybe a special prosecutor. I won't have to testify at that point. But, again, as we have set forth in our brief, we do believe that the Court lacks jurisdiction, because this petition for review is untimely filed by one day, and that the rule in Martinez-Serrano has now been supplanted by the change in the legislation by the change in the governing statutory provision at section 1252b1. Do you agree, though, that if we find that on these facts that everyone was misled, that we can nonetheless conclude that it was still timely by one day? I would not concede that, Your Honor, because the plain language of the statute itself should govern, and the statute plainly says it is the date of the order itself that governs, and under the Supreme Court's decision in Stone, the terms of the statute must be construed with strict fidelity to its terms. And there's absolutely no other way to construe the date of this order, particularly in light of the deletion of the date of the issuance language, other than to refer to the actual date of the order itself. And in this case, that was September 16. And so since the petition for review was filed one day late on October 17, the Court would lack jurisdiction. And I would also cite to that the fact that the statute does not govern by the date of the order itself. Well, I have no idea when counsel checked the automated system, whether it was before or after the we filed our motion to dismiss, but certainly that reason was not advanced in his opposition to our motion. We don't have any evidence in the REC. I mean, that's Mr. Cruz's representation, which we, of course, you know, accepted. Right. Exactly. But again, counsel's representations are not evidence that would be considered by this Court. Counsel, are you aware of any case law that says that a stay not granted by judges is a valid stay? Other than outside of the administrative context? In any context. I'm trying to find a statutory authority for staff attorneys to enter stays, and I can't find it. I am not aware offhand, Your Honor. I'm a little unclear, and I confess this is my own work. What's the government's position? Do you just want these stays granted willy-nilly? Is that it? Are you not equipped to contest them or what? Well, no, Your Honor. And in fact, in the Eleventh Circuit, we have successfully prevailed on making sure that the 1252B's F standard applies, and that that case is winged. That's contrary to the Ninth Circuit standard. There is a circuit split, and we have brought the attention of the Supreme Court and Justice Kennedy issued in Kenyiras, K-E-N-Y-E-R-S. He cited by dissent in a Ninth Circuit case as a footnote in that. Exactly. And so it is an important issue. In that in-chambers memorandum, right? That's correct, Your Honor. All right. Is there any other case pending anywhere in the system that you're aware of? We wouldn't know all this. I see. No, she's been with them a while. She understands this, I think. Oh, okay. But is there any other case pending any place that you're aware of where the issue is presented and on its way up? Not that I'm aware of, Your Honor. Okay. But again, I'm But it is done pursuant to general orders, and general orders are approved by the Court. I'm not well-versed enough to answer that question in terms of what the legal authority is and how binding it is, the effect of general orders. You said the other – beside the Eleventh Circuit, are there other circuits who are doing the same thing that the Ninth Circuit is doing? Not the general order, but they are applying the injunctive standard rather than the 242F standard that we've heard. So they're not granting automatic stays like we do on the filing of the petition? No. No. And let me, unless the Court has any further questions on the interstitial issue. I'm just guessing, but I think one of the reasons that we do that is that we'd be inundated with petitions for automatic stays. We already are. We've got eight cases for one calendar. Well, this is not an inundation. It's just a drop in the bucket. And tomorrow, and the next survey. That's right. And so I think that's why it was adopted. And again, perhaps this may not even be an issue, if I'm correct. And the BIA went to one-member orders, and they were one-liners, and we've gotten a flood of cases recently. So have we, Your Honor. It's my understanding that there was no stay requested in this case. Is that correct? I don't believe that a motion for a stay was even filed in this case. So I don't think that would be an issue. But maybe I'm wrong. There was a motion for a stay. Oh, okay. Yes, there was. And I'm not being there for a stay requested, Your Honor. Moving on, very briefly, I see that my time is almost up, and I do want to advise the Court that I have another argument immediately after this one in courtroom two. You filed a notice of non-opposition. Okay. That's your official position. Thank you. On the Fourth Amendment issues, if the Court should reach that issue, again, our position is that in this case there was no egregious Fourth Amendment violation, and that the exclusionary rule does not generally apply in immigration proceedings. In this court in Oragagi, I believe, I butchered that name, but I believe that's the case that holds it, it has to be an egregious violation of the Fourth Amendment in order to qualify for suppression. What did the Border Patrol officer say in this case? He said that he and his partner were cruising on the road at less than 35 miles an hour, and they were in a motel where they saw Mr. Ramirez coming out of the motel, hailing a cab that was coming into the next, the parking lot of the auto parts store next door, and then walked straight to the cab. And they found this a little bit, it raised their interest. It wasn't enough to stop them, but certainly was efficient for them to prompt the two officers to observe. Well, how about his dress and appearance? He did say that because Mr. Ramirez was wearing a silk shirt, which in the agent's experience was popular with individuals who have come directly or recently from Mexico, that that was also a factor that prompted them to observe what Mr. Ramirez was doing. Did they say anything about his appearance? He did say that that was a factor that he took into consideration, yes. Is he saying about his Mexican appearance? Yes. He said that was a relevant factor that they took into account. But again, it has to be kept in mind, first of all, this is not a vehicle stop. And so there was no probable cause or reasonable suspicion of illegal criminal activity wasn't even required. This was a Terry stop. The taxi had already stopped, and Mr. Ramirez and the occupants were already out of the taxi when the Border Patrol agents approached them. What was the criminal activity that was afoot? Well, given the agent, the agent Lewis's experience during the past few weeks, he and his partner thought their actions, Mr. Ramirez and the other four undocumented aliens, their actions were consistent with a pattern that they had discovered regarding alien smuggling, which was that the aliens would stay overnight at a motel or a local hotel, meet their smuggler that would all pile into a taxi that would take them to the bus terminal. Why don't they just wait until the people come out of the hotel? And as they come out, just stop them right then and there? Well, that's not what happened here. I mean, they could do that. That would be an efficient way to do it. It would be efficient. I don't believe that it would be, depending on what the circumstances were, certainly there may or may not be Fourth Amendment issues that would be implicated as well. That's a motel where illegal aliens stay, you know, after they've been smuggled into the country. That's correct. And so that was one of the factors that the agent took into consideration when he and his partner decided that they had sufficient information based on the actions that they had observed and the fact that they were on all four squares with the pattern for alien smuggling that they had encountered in the past recent weeks and the 30 arrests of other aliens that they had conducted just recently. That was sufficient for them to approach Mr. Ramirez and the other four occupants of the taxi to question them about their right to be and to remain in the United States, in other words, to question them about their immigration status. And at that point, all four, all of the passengers, all four of the undocumented aliens and Mr. Ramirez answered his questions willingly. There's been no allegation that that was a nonconsensual exchange. And so once that the information came to them that one of the individuals is an undocumented alien. I'm sorry about the Terry stuff. Excuse me? I was just asking you about the Terry stuff. Okay. Have I answered that question? I'm not sure. Oh, I think you did. Okay. Yeah. And then the last issue, I'll wind up on the Fourth Amendment issue because I think we've submitted our position on our briefs. But on the very last issue that Mr. Ramirez has gone, and I'm well over my time if I could have a few minutes on that. The due process issue, let me first point out that there was no due process violation. Although Mr. Ramirez's counsel was given only 15 minutes initially to go through the documents, he was provided with a full opportunity to explore the agent's testimony, plus an additional two months after that. Well, that's a pretty rotten way to treat a lawyer, isn't it? Well, it wasn't. Isn't that? It wasn't ideal. I wouldn't like it. No, of course, I wouldn't like it either. But it wasn't ideal, Your Honor, because it certainly wasn't ideal. But until the government had proffered any evidence to the immigration judge, arguably there was no basis for a motion to suppress. Any motion to suppress would have been premature because there would have been no evidence to suppress. For all we know, the INS might not have even offered certain evidence that it thought was obtained through a federal amendment violation. But I mean, is that type of evidence offered to counsel before a hearing generally? I believe there are some immigration courts nationwide with local rules that require both parties to submit pre-hearing statements, which include a list of exhibits that they plan to file with the court and use at the hearing. There's been no indication in this record that that was invoked or that that would be the local procedures that would apply. I also got no notice. They just the witness testified. They hand him a stack of papers. How thick were they? Do you know? No. From what I know, it was 10 pages or so. Ten pages? Yes. How thick was the paper? These were the exhibits in the record. Oh, okay. And then so he gets 10 minutes to look them over? Yes. 15? Yes. And I mean, technically, he had he did have his client to question. And having known the version of events from his client, he could have compared that pretty, if not as thoroughly as he would like, at least sufficiently enough to determine if there were any discrepancies. The lawyer there was not Mr. Cruz. It was, Your Honor. Mr. Cruz. You were the lawyer? I was, Your Honor. Okay. And if there's any subject to any other questions, then we would submit. And if the Court would excuse me, I would have to go to the courtroom to you right now. Thank you. Who are you appearing before now? Judges Nelson, Fernandez, and Kleinfeld. All right. Have a good day, what's left of it. Have a good day. Your Honor, we're way beyond time. Can I just make a very brief point? Sure. Thank you, Your Honor. No more than two minutes. Thank you. Your Honor, again, regarding whether or not there was a vehicle stop versus a non-vehicle stop, that's really not an issue in this case. And the reason for that is you're applying the same standard of reasonable suspicion. And so, again, you can look at the same cases that have considered that issue because it's dealing with reasonable suspicion. And again, Your Honor, I would submit to the Court that giving counsel 10 minutes, which turned out to be 15 minutes to review these documents, which were more than 10 pages. I remember there were at least 15 to 20 pages, and I don't have the record. Your Honor, have you ever practiced criminal law? Your Honor, I do appear in criminal court. Are you familiar with the Jenks Act? I'm sorry, with what, Your Honor? The Jenks Act. I am not, Your Honor. Okay. Under Section 3500 of Title 18, the government is not required to produce any of the statements of its witnesses until after the witness has testified on direct examination. So it's not uncommon, although judges don't like it, for defense counsel not to get the statements of the witness who has just testified until just this time at the trial. And then you run into the problem that, obviously, you ran into here, where you get either 10 or 15 minutes or you ask for an adjournment of the proceeding or the trial so that you can prepare a more effective cross-examination. Yes, Your Honor. I would say that the major difference between these two scenarios, however, is that in one case, you know well in advance that that is the way the court functions, that is the way you're going to be served with documents. You know exactly what to expect. You can prepare yourself for that type of scenario. I guess the reason I'm drawing the analogy to the Jenks Act is that if in a criminal case that, by statute, is permissible, then how is due process offended in a civil immigration case where the judge essentially gives you an adjournment and the right to recall witnesses and continue taking the testimony? Your Honor, if I may, because it goes, in my opinion, to notice. There you have a clear section, statute of the law that says, counsel, you are expected to conduct yourself in such a way, in this manner, and these are the guidelines and the rules that have been set forth. In immigration court, Your Honor, we don't have that. Common practice is to give counsel that information. I didn't receive it. And for lack of notice alone, that was clearly here a violation of due process. Thank you, Your Honor. I appreciate the Court's time. Well, you know, when I was a district judge, we had the Jenks Act. And, you know, the practice in the U.S. Attorney's Office was to make Jenks Act material available to counsel, you know, before the trial or several days in advance of when that witness was going to be called. And so that was a practice then. And when there was resistance to that, what I'd do is I'd say, fine. Okay. You put the witness on direct. Give counsel a Jenks Act material. We'll stop the trial. We'll come back in two weeks, and we'll go on. That would have certainly been the most beneficial way for counsel to conduct that cross-examination. And I'm going to ask you for that. Was Judge Preggerson violating due process? No, no, no. Absolutely not, Your Honor. I didn't think so. Absolutely not. Thank you, Your Honor. Thank you. Thank you, Your Honor. That's it. All right. Submitted.
judges: Pregerson, Beezer, Tallman